UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X
KATIE CHURCH, JOSH DOLAN, DINA
GINZBURG, TAIM ISREB, BARBARA TAAM,
and MILTON TAAM, individually and on behalf of
all others similarly situated,

|  |  |
|---|---|
| Plaintiffs and Proposed Class Representatives, | **CLASS ACTION COMPLAINT** |
|  | **DEMAND FOR JURY TRIAL** |
| -against- | **Index No.:** |
|  | **3:26-cv-381 (ECC/MJK)** |

CORNELL UNIVERSITY; CORNELL
UNIVERSITY POLICE DEPARTMENT;
MICHAEL KOTLIKOFF, in his individual and
official capacities as President of Cornell University;
KRISTIN C. HOPKINS, in her individual and
official capacities; LIEUTENANT MICHAEL
SCOTT, in his individual and official capacities;
SERGEANT KYLE SANDY, in his individual and
official capacities; OFFICER WILLIAM D.
CARPENTER, in his individual and official
capacities; OFFICER SCOTT R. GRANTZ, in his
individual and official capacities;  OFFICER
BEVERLY VAN CLEEF in her individual and
official capacities; OFFICER BRYANT WYANS in
his individual and official capacities; OFFICER
JOSEPH CANZANO in his individual and official
capacities; and JOHN and JANE DOES 1–20,

                                    Defendants.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X

**CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Plaintiffs KATIE CHURCH, JOSH DOLAN, DINA GINZBURG, TAIM ISREB, BARBARA

TAAM and MILTON TAAM, by and through their undersigned attorneys, and proceeding on behalf of a proposed class, allege as follows:

## PRELIMINARY STATEMENT

1. This civil rights action arises from the mass arrest of at least seventeen individuals—students, faculty, alumni, and community members—at Cornell University on the night of March 10, 2025.

2. Plaintiffs and the class they propose to represent are referred to herein as "arrestees."

3. All of the arrestees were arrested for engaging in protected political expression at a ticketed public event called "Pathways to Peace" at Bailey Hall. Each possessed a valid ticket to attend.

4. Each of the arrestees was charged with disorderly conduct, despite the absence of probable cause to charge them with that offense.

5. None of the seventeen arrestees were convicted of any offense. Most accepted Adjournments in Contemplation of Dismissal ("ACDs") under prosecutorial pressure; several had their charges voluntarily dismissed for lack of evidence.

6. Some arrestees, including Dina Ginzburg and Barbara Taam, were arrested outside the auditorium after voluntarily leaving the event.

7. At least one arrestee was arrested for simply wearing a keffiyeh and did not say anything at all.

8. None of the arrestees engaged in violence.

9. The only act of physical violence that evening occurred when a pro-Israel audience member threw a backpack at a person being escorted out. That person was never arrested.

10. The arrests did not happen by accident. They occurred against a backdrop of escalating

federal pressure on Cornell to demonstrate aggressive enforcement against pro-Palestinian expression. Plaintiffs allege that Cornell's senior administration, including President Kotlikoff and Kristin C. Hopkins, coordinated with the Cornel University Policy department ("CUPD") to use the event as an opportunity to effect arrests of Palestinian rights advocates

11. Cornell, acting through its senior administrators and in coordination with CUPD, participated in and directed the arrests of attendees based on the content and viewpoint of their expression.

12. Body-worn camera footage captures law enforcement officers, before the event began, donning gloves while laughing about attendees wearing keffiyehs as people they "need to look out for." One officer then says, while laughing: "When these come out, what does that mean, Bill? It means 'f*** around and find out."

13. After the arrests, the footage shows Ms. Hopkins, Chief Administrator to the President and Provost, and a former CUPD officer herself, asking Lieutenant Scott how many had been arrested. When told approximately six to eight, she replied: "He was just hoping the number would be more—than eight-ish." Officers then openly brainstormed how to arrest additional individuals, including a woman who had been filming.

14. This action seeks damages and injunctive relief arising under 42 U.S.C. § 1983, the First Amendment, the Fourth Amendment, and the Fourteenth Amendment to the United States Constitution, as well as under New York State common law for false arrest, false imprisonment, and malicious prosecution.

## JURISDICTION AND VENUE

15. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because

this action arises under 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments to the United States Constitution.

16. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because those claims arise from the same nucleus of operative facts as the federal claims.

17. Venue is proper in the Northern District of New York pursuant to 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in Ithaca, Tompkins County, New York.

**PARTIES**

**Plaintiffs and Proposed Class Representatives**

18. Plaintiff **KATIE CHURCH** is a resident of Tompkins County, New York. Ms. Church had a valid ticket to the Pathways to Peace event. She is a co-founder of the not-for-profit Youth Farm Project and has served as a leader and Board Member of that organization for over a decade.

19. Plaintiff **JOSHUA DOLAN** is a resident of Tompkins County, New York. Mr. Dolan had a valid ticket to the Pathways to Peace event. He is a co-founder of Mutual Aid Tompkins and has worked extensively to provide food, shelter, and necessities to community members in need.

20. Plaintiff **DINA GINZBURG** is a student enrolled in one of Cornell University's statutory colleges and a resident of Tompkins County, New York. Ms. Ginzburg is Jewish, and at the time of her arrest she had voluntarily left Bailey Hall Auditorium and was arrested as she made her way outside the building.

21. Plaintiff **TAIM ISREB** is a student enrolled in one of Cornell University's statutory colleges and a resident of Tompkins County, New York. At all relevant times, Plaintiff

Isreb was exercising their constitutionally protected rights to free expression. They were also an authorized participant in the Pathways to Peace Q&A session, having submitted their question in advance through Cornell's official process and been told they were allowed to speak.

22. Plaintiff **MILTON TAAM** is an alumnus of Cornell University. Mr. Taam was arrested at the event, but the Tompkins County District Attorney later moved to dismiss all charges against him for lack of evidence, after no witnesses came forward to support the prosecution.

23. Plaintiff **BARBARA TAAM** is a Cornell University alumna and the spouse of Plaintiff Milton Taam. Ms. Taam was arrested separately at the event after she had voluntarily walked out of the auditorium. The District Attorney later moved to dismiss all charges against her as well for lack of evidence.

24. Plaintiffs reserve the right to add additional named plaintiffs among the remaining approximately eleven individuals arrested on March 10, 2025, upon further investigation and client consultation or as any need for subclasses arises.

**Defendants**

25. Defendant **CORNELL UNIVERSITY** ("Cornell") is a hybrid private-public university incorporated under the laws of the State of New York, with its principal campus located in Ithaca, New York.

26. In addition to its privately operated colleges. Cornell operates several "statutory" or "contract" colleges—including the College of Agriculture and Life Sciences, the College of Human Ecology, the School of Industrial and Labor Relations, and the College of Veterinary Medicine—pursuant to contracts with the State of New York and the State University of New York ("SUNY").

27. These statutory colleges are funded by New York State appropriations, and their employees function as state employees.

28. Cornell also operates the Cornell University Police Department ("CUPD"), a law enforcement agency organized pursuant to New York Education Law § 355(2)(l) and possesses full police powers under New York law.

29. Through its operation of the statutory colleges and CUPD, Cornell exercises powers traditionally reserved to the State. Accordingly, Cornell acts under color of state law for purposes of 42 U.S.C. § 1983.

30. Cornell further acted jointly and in concert with CUPD officers and other state actors in planning, directing, and carrying out the arrests and prosecutions described herein.

31. Defendant **CORNELL UNIVERSITY POLICE DEPARTMENT** ("CUPD") is a law enforcement agency organized pursuant to New York Education Law § 355(2)(l) with authority to exercise police powers on and around the Cornell University campus.

32. CUPD officers are sworn peace officers under New York Criminal Procedure Law §2.10 and Education Law §355. They are authorized to enforce the New York Penal Law, make arrests for criminal offenses, carry firearms, issue criminal citations, and initiate criminal prosecutions in the courts of the State of New York.

33. Individuals arrested by CUPD are charged with violations of the New York law and prosecuted in the courts of the State of New York. In exercising these powers, CUPD officers perform functions traditionally reserved to the State and therefore act under color of state law within the meaning of 42 U.S.C. §1983.

34. Defendant **MICHAEL KOTLIKOFF** is the President of Cornell University. At all relevant times, Defendant Kotlikoff directed the planning and execution of the events

described herein, coordinated with CUPD regarding the arrests of attendees, and, through his agent Kristin C. Hopkins, expressed his intent and desire to arrest as many pro-Palestinian attendees as possible. He is sued in his individual and official capacities.

35. Defendant **KRISTIN C. HOPKINS** is the Chief Administrator to the President and Provost of Cornell University and a former Cornell University Police Officer of ten years. She was in charge of the Pathways to Peace event on March 10, 2025. She prepared or caused the preparation of voluntary statements submitted with the accusatory instruments against Plaintiffs. She communicated with CUPD officers during and after the arrests, conveyed President Kotlikoff's desire for more arrests, and participated in brainstorming how additional protesters could be arrested. She is sued in her individual and official capacities.

36. Defendant **LIEUTENANT MICHAEL SCOTT** is a CUPD officer who prepared supporting depositions used in the prosecutions of several Plaintiffs, including Plaintiffs Church and Dolan, three days after the event. He communicated with Defendant Hopkins during and after the arrests and carried out and supervised the selective false arrests of Plaintiffs and others based on their viewpoints. He is sued in his individual and official capacities.

37. Defendant **SERGEANT KYLE SANDY** is a CUPD officer who prepared supporting depositions used in the prosecutions of Plaintiffs Ginzburg and others and assisted with arresting people based on their viewpoint. He is sued in his individual and official capacities.

38. Defendant **OFFICER WILLIAM D. CARPENTER** is a CUPD officer who participated in the arrests and processing of Plaintiffs based on their viewpoints. He is sued in his

individual and official capacities.

39. Defendant **LIEUTENANT BRANDON FRISBIE** is a CUPD officer who participated in the arrests and processing of Plaintiffs based on their viewpoints. He is sued in his individual and official capacities.

40. Defendant **OFFICER SCOTT R. GRANTZ** is a CUPD officer who participated in the arrests and processing of Plaintiffs based on their viewpoints. He is sued in his individual and official capacities.

41. Defendant **OFFICER BEVERLY VAN CLEEF** is a CUPD officer who participated in the arrests and processing of plaintiffs based on their viewpoints. She is sued in her individual and official capacities.

42. Defendant **OFFICER BRYANT WYANS** is a CUPD officer who participated in the arrests and processing of plaintiffs based on their viewpoints. He is sued in his individual and official capacities.

43. Defendant **OFFICER JOSEPH CANZANO** is a CUPD officer who participated in the arrests and processing of plaintiffs based on their viewpoints. He is sued in his individual and official capacities.

44. Defendants **JOHN and JANE DOES 1–20** are CUPD officers, Cornell University officials, and other individuals whose identities are currently unknown to Plaintiffs and who participated in planning, executing, directing, or ratifying the arrests and prosecutions described herein. Plaintiffs will seek to identify these individuals through discovery.


**FACTUAL BACKGROUND**

**I.    Cornell Under Federal Pressure to Suppress Pro-Palestinian Expression**

45. Prior to the events at issue here, Cornell had already faced criticism for its response to pro-Palestinian protest activity on campus. Since October 2023, Cornell has pursued criminal charges against dozens of students (most or all of which were dismissed) and has initiated university disciplinary actions against many additional students engaged in advocacy concerning Palestinian rights.

46. In October 2024, reporting revealed that Cornell administrators had participated in a Zoom meeting with parents affiliated with Cornell Hillel in which they discussed disciplinary actions against student protesters and described reviewing or monitoring faculty speech related to pro-Palestinian protest activity.[1]

47. On January 29, 2025, President Trump issued Executive Order 14188, targeting campus "antisemitism." The order directed federal agencies to investigate universities for alleged antisemitism related to campus protests and to examine complaints arising after the October 7 attacks.[2]

48. On February 3, 2025, the administration created a federal Joint Task Force to Combat Anti-Semitism involving the Department of Justice, the Department of Education, the Department of Health and Human Services, , and other federal agencies.[3]

49. In late February 2025, Cornell implemented a university-wide hiring freeze in response to uncertainty regarding future federal funding. In a letter to faculty and staff, President Kotlikoff called for "a sustainable university budget," announced "strategic budget adjustments," and paused all hiring except for "mission-critical positions."[4] "The potential

---

[1] See https://www.cornellsun.com/article/2024/10/administrators-discuss-disciplining-protesters-monitoring-faculty-in-private-hillel-parents-meeting

[2] See https://www.federalregister.gov/documents/2025/02/03/2025-02230/additional-measures-to-combat-anti-semitism

[3] See https://www.justice.gov/opa/pr/justice-department-announces-formation-task-force-combat-anti-semitism

[4] See https://www.ithaca.com/news/ithaca/cornell-implements-hiring-freeze-as-federal-funding-uncertainties-loom/article_478371b8-f600-11ef-880f-a732881cf469.html

for deep cuts in federal research funding, as well as tax legislation affecting our endowment income, has now been added to existing concerns related to rapid growth and cost escalations," Kotlikoff wrote.[5]

50. On March 7, 2025, the administration revoked $400 million in federal funding from Columbia University over alleged failures to address campus protests. That action signaled the administration's willingness to use federal funding as leverage in its oversight of universities.[6]

51. Cornell administrators, including President Kotlikoff and his senior staff, were acutely aware of this federal pressure on universities over pro-Palestinian campus activity and the potential financial consequences for Cornell.

52. On March 10 – the same day as the Pathways to Peace event – the U.S. Department of Education's Office for Civil Rights sent letters to 60 universities, including Cornell, warning "of potential enforcement actions if institutions do not fulfill their obligations under Title VI of the Civil Rights Act to protect Jewish students on campus."

## II.      The Pathways to Peace Event

53. On March 10, 2025, Cornell University hosted a public event entitled "Pathways to Peace" (the "Event") at Bailey Hall, 230 Garden Avenue, Ithaca, New York, from approximately 6:00 p.m. to 8:00 p.m.

54. The Event was described as offering "a wide-ranging conversation on regional politics, power dynamics, and the historic and ethnic conflicts that have shaped the region, as well

---

[5] See https://ithacavoice.org/2025/02/cornell-freezes-hiring-asks-department-heads-to-cut-costs-amid-financial-uncertainty/
[6] See https://www.npr.org/2025/03/07/nx-s1-5321326/trump-administration-columbia-university-400-million-cancelled

as potential paths forward for the people of Israel and Palestine."[7]

55. The Event occurred against the backdrop of escalating federal pressure on universities described above.

56. Event panelists included: Ryan Crocker, former United States Ambassador to Afghanistan, Iraq, Pakistan, Kuwait, and Lebanon; Tzipi Livni, former Foreign Minister and Vice Prime Minister of Israel; Dr. Salam Fayyad, former Prime Minister of the Palestinian Authority; and Daniel B. Shapiro, former United States Ambassador to Israel.

57. Tzipi Livni is a former Israeli Foreign Minister who served in Israel's government during the 2008–2009 military operations in Gaza. Her role in those operations has made her a controversial figure among critics of Israeli policy, including some members of the Cornell community who oppose Israel's conduct toward Palestinians. Livni has also been the subject of attempted legal actions in European courts relating to allegations of war crimes arising from those operations. For example, in 2009 a British court issued an arrest warrant for Livni in connection with such allegations, though the warrant was later withdrawn after she cancelled a planned visit to London.[8]

58. Given Livni's public role and controversy surrounding her record, her participation made strong audience reactions foreseeable.

59. The Event was ticketed and open to the Cornell community and the general public. Every one of the arrestees held a valid ticket and was lawfully present at Bailey Hall.

60. The Event was heavily monitored by CUPD and private security. Tickets and bags were checked at the door.

61. For the Q&A portion of the event, Cornell required attendees to "pre-submit questions no

---

[7] See https://events.cornell.edu/event/pathways-to-peace
[8] See https://www.reuters.com/article/world/british-court-issued-arrest-warrant-for-livni-report-idUSTRE5BD56C/

later than Wednesday, March 5, at 2pm." Attendees whose questions were selected were told that they would be "notified in advance and given the opportunity to ask [their question] live during the 45-minute Q&A session.".[9]

### III.    Pre-Event Planning to Target Palestinian Supporters

62. Before the Event began, CUPD officers were already identifying and surveilling members of the audience by keffiyehs, scarves, and similar markers of perceived cultural and political identity. Body-worn camera ("BWC") footage documents the following:

    a.   A CUPD officer put on rubber gloves while laughing and said: "When these come out, what does that mean, Bill? It means 'f*** around and find out'." The officers were laughing.

    b.   CUPD officers were seen pointing out specific individuals they suspected would be arrested, identifying those wearing keffiyehs—traditional Palestinian head coverings—as people they "need to look out for." An officer specifically called these "polka dotted scarves."

    c.   Officers also identified targets by reference to "shawls" worn by certain attendees, also referring to keffiyehs and pointing out that those wearing them should be particularly watched.

    d.   Officers expressed displeasure that certain individuals they had identified as likely to be arrested were seated in "reserved spots."

### IV.    The Event Itself

63. During President Kotlikoff's opening remarks, he issued what Ms. Hopkins described as

---

[9] See https://events.cornell.edu/event/pathways-to-peace

the "speech management statement"—a statement read at Cornell events reminding the audience of Cornell's values of free inquiry and explaining that those who disagree may express their views appropriately.

64. President Kotlikoff did not advise that anyone would face arrest for unwanted expression. He stated that those who interfered with others' ability to hear the panelists would be asked to leave, and that a protest area was available outside on Bailey Plaza.

65. During the introduction of the panelists, sporadic expressions of disapproval were voiced by some audience members. These included shouts of phrases such as "war criminals" and "from the river to the sea."

66. There were also several pro-Israel expressions voiced by the audience out of turn.

67. At approximately 6:20 p.m., President Kotlikoff returned to the podium and issued a second warning to the room that those who were disruptive would have to leave.

68. At various points in the rest of the event, some audience members left voluntarily. Others were escorted out by CUPD. Some complied immediately when asked; others were escorted without resistance.

69. At no point did any of the arrestees engage in physical violence, threaten any person, damage property, or refuse to comply with lawful law enforcement orders.

70. A pro-Israel attendee threw a backpack at a protester being escorted from the hall. This was the only act of physical violence at the event. That individual was not asked to leave, was not detained, and was not arrested—despite Plaintiffs and others bringing this to the attention of CUPD officers.

71. CUPD officers present saw and were aware of the backpack incident and took no action against the perpetrator before, during, or after the event.

72. During the Q&A portion of the event, some arrests also occurred, including the arrest of Taim Isreb while they were exercising a pre-approved right to speak.

73. In total, at least seventeen individuals were arrested at or near Bailey Hall on March 10, 2025, and charged with disorderly conduct in violation of New York Penal Law § 240.20(4).

## V.    Federal Escalation and Subsequent Scrutiny

74. On or about April 8, 2025, or about the same day that the arrestees were arraigned, the Trump Administration froze more than $1 billion in federal grants and contracts to Cornell, citing Cornell's alleged failure to address antisemitism—a category that, in practice, encompassed constitutionally protected pro-Palestinian expression.[10]

75. Cornell had already been arresting and disciplining students who engaged in pro-Palestinian protest activity. By October 14, 2025, Cornell's handling of such protests had attracted formal international scrutiny.

76. On that date, five United Nations Special Rapporteurs—appointed by the UN Human Rights Council and acting pursuant to Council resolutions—sent a formal letter directly to President Kotlikoff, expressing "serious concern over reported human rights violations" arising from Cornell's treatment of pro-Palestinian students.[11]

77. The letter was sent to only five universities in the United States. The Special Rapporteurs specifically cited the cases of two Cornell PhD students, Momodou Taal and Amandla Thomas-Johnson, whose immigration statuses were revoked following their pro-Palestinian activism, and noted Cornell's suspension of both students without providing

---

[10] See http://nytimes.com/2025/04/08/us/politics/cornell-northwestern-university-funds-trump.html
[11] See https://spcommreports.ohchr.org/TMResultsBase/DownLoadPublicCommunicationFile?gId=30406

evidence until after their suspensions had been ordered.[12]

78. The Rapporteurs concluded that "structural changes at universities to systematically repress expressions of solidarity with Palestine has created a climate of fear and intimidation," and that students were "self-censoring political expression" as a direct result. They specifically requested that President Kotlikoff explain how Cornell "intend[ed] to prevent or revert the systematic repression of expressions of solidarity with Palestine." Cornell did not respond.[13]

79. In November 2025, Cornell settled with the Trump Administration, reportedly paying $30 million directly to the Administration and committing an additional $30 million to designated research programs, in exchange for restoration of federal funding.[14]

## VI.   Individual Plaintiff Circumstances

### Plaintiff Katie Church

80. Plaintiff Katie Church lives in Tompkins County, New York.  She is deeply committed to issues of racial justice and human rights, including the rights of Palestinian people and their treatment by Israel.

81. Ms. Church is a member of the Temple Beth-El Synagogue in Ithaca, New York, where her husband has been a member since birth and her son had his Bar Mitzvah.

82. At the Event, Ms. Church was seated in the audience next to another arrestee, Plaintiff, Josh Dolan, when she was escorted out of Bailey Hall at approximately 6:24 p.m.

83. Body-worn camera ("BWC") footage shows Ms. Church seated peacefully. The footage contains no audio establishing what, if anything, she said.

---

[12] *Id.*
[13] *Id,*
[14] See https://www.whitehouse.gov/fact-sheets/2025/11/fact-sheet-president-donald-j-trump-secures-major-settlement-with-cornell-university/

84. The supporting deposition against Ms. Church, prepared by Lieutenant Scott three days after the event, alleged she "did begin shouting out 'Free Palestine' and 'From the River to the Sea' directed towards the speakers and audience members' and 'continued to cause disruptions requiring removal.' Lieutenant Scott represented that these allegations were based on his "personal knowledge"—despite the absence of BWC audio capturing any such statements and lack of contemporaneous documentation identifying Ms. Church specifically.

85. Ms. Church did not shout and had no intention of causing public inconvenience, annoyance, or alarm as required for prosecution under New York's disorderly conduct statute.

86. Ms. Church was cooperative in every respect when asked to leave.

87. The arresting officer stated repeatedly on camera that Ms. Church had been "exceedingly cooperative." He noted that she and Plaintiff Dolan (arrested with her) had "said their piece" and explained that "there was a process" requiring arrest. The officer further told Ms. Church that she would not be issued a persona non grata order because her conduct did not rise to that level.

88. Nevertheless, Ms. Church was arrested and charged with a criminal offense and issued a persona non grata notice.

89. The "process" referenced by the arresting officer consisted of taking Ms. Church's identification and serving her in the coming days with a criminal charge requiring her to appear in court for alleged "disorderly conduct."

90. Ms. Church informed the officer that a pro-Israel attendee had thrown a backpack at a person being escorted from the hall. Upon information and belief, the officer did not

investigate the incident.

91. Ms. Church was later arraigned and ultimately accepted an ACD after multiple appearances. She was offered a six-month ACD, reflecting the two-tiered offer structure discussed below.

92. Ms. Church was issued a "persona non grata" notice by CUPD barring her from Cornell University property for one year and was required to retain counsel and appear in court on multiple occasions.

93. Cornell owns a substantial portion of property in Ithaca, New York, Ms. Church's hometown The persona non grata order therefore significantly restricted Ms. Church's ability to move freely in her own community and to attend concerts, lectures, political events and meetings with colleagues.

94. Although Ms. Church's criminal charges were ultimately sealed, public reporting of the arrests means that her name will forever be associated with the events at issue.

**Plaintiff Joshua Dolan**

95. Plaintiff Joshua Dolan is a resident of Tompkins County, New York.

96. Early in the Event, the former Ambassador made some remarks about having a "night cap in Gaza." Mr. Dolan responded from the audience that "no one's having night caps in Gaza," to which the speaker replied, "well, non-alcoholic ones."

97. At approximately 6:24 p.m., Mr. Dolan was seated in the audience when CUPD officers approached and escorted him out of Bailey Hall. BWC footage shows him seated peacefully. The footage contains no audio to establish what he said prior to being escorted out.

98. As Mr. Dolan was being escorted out, a pro-Israel audience member became visibly agitated, yelling, and throwing a backpack at a person being escorted ahead of Mr. Dolan.

Mr. Dolan alerted the arresting officer that the individual had committed an act of physical violence against another attendee. The officer took no action to detain or arrest the person who threw the backpack.

99. While Mr. Dolan was being escorted out, another pro-Israel audience member shouted out that the pro-Palestinian activists did not even know what "river" they were talking about. That individual was not detained or charged. Mr. Dolan's response dentifying the river referenced in the phrase was later cited in his arrest report.

100. Like Plaintiff Church, Mr. Dolan was cooperative when asked to leave the Event. The arresting officer stated repeatedly on camera that Mr. Dolan had been "exceedingly cooperative." The officer remarked that Mr. Dolan and Ms. Church had "said their piece" and explained that there was a "process" requiring arrest. He further told Mr. Dolan that his conduct did not rise to the level requiring a persona non grata order.

101. Nevertheless, Mr. Dolan was charged with disorderly conduct. The sworn supporting deposition was issued by Lieutenant Scott, who checked the box indicating "personal knowledge" despite the absence of BWC footage showing disorderly conduct and despite the officer's comments that Mr. Dolan had acted cooperatively.

102. Contrary to this, he was issued a persona non-grata notice by CUPD barring him from Cornell University property for one year, which substantially restricted his ability to move freely within Ithaca for professional and personal purposes.

103. Mr. Dolan was arraigned, pleaded not guilty, and ultimately accepted an ACD after extensive delay and litigation. He was offered a six-month ACD, reflecting the two-tier offer structure described below.

104. As a result of the arrest, Mr. Dolan was required to retain counsel and defend himself in

criminal proceedings.

**Plaintiff Dina Ginzburg**

105. Plaintiff Dina Ginzburg is Jewish and a student in one of Cornell's statutory colleges.

106. During the event, Ms. Ginzburg briefly stood, uttered a short phrase in Hebrew expressing her objection to what she was witnessing, and then voluntarily left the Event.

107. Ms. Ginzburg was arrested outside of Bailey Hall after she had already exited the Event. She was charged with disorderly conduct.

108. The supporting deposition prepared by Sergeant Sandy three days later alleged only that Ms. Ginzburg had "stand up in the middle of the event and shout in a loud voice at the presenters speaking on stage"—without identifying what she said or explaining how the alleged conduct constituted disorderly conduct rather than constitutionally protected speech. Sergeant Sandy checked the box indicating that the allegation was based on "personal knowledge."

109. Following her arraignment, the Tompkins County District Attorney moved to dismiss the charges against Ms. Ginzburg for insufficient evidence.

110. Ms. Ginzburg was nevertheless issued a persona non grata order barring her from Cornell University property—an especially severe consequence for a student enrolled at the university.

111. Although the charge against Ms. Ginzburg was dismissed for insufficient evidence, the arrest and prosecution have had continuing consequences for her, including academic disruption, reputational harm, and the burden of defending herself against criminal charges.

**Plaintiff Taim Isreb**

112. Plaintiff Taim Isreb is a student at one of Cornell University's statutory colleges. Prior to the event, they submitted a question application for Cornell's preapproval process and were

selected and authorized to ask a question during the event's Q&A session.

113. When Plaintiff Isreb rose to speak during the Q&A portion of the event, they began by making brief remarks drawing attention to Cornell's arrest of peace activists in the context of the ongoing ethnic cleansing in Gaza.

114. As Plaintiff Isreb spoke, the individual holding the microphone attempted to pull it away. Plaintiff Isreb attempted to finish their remarks without the assistance of the microphone.

115. At that point, CUPD officers approached Plaintiff Isreb, escorted them out of Bailey Hall, and took their identification in order to process them for arrest.

116. Plaintiff Isreb was subsequently charged with disorderly conduct.

117. The basis for the arrest was not their pre-approved question, but rather the content of their remarks about Gaza.

118. As CUPD officers were escorting Plaintiff Isreb out of the building, a CUPD officer asked them whether they were Hasham Khan, a Cornell student who had written an opinion piece in the *Cornell Sun* that day criticizing the choice of panelists.

119. Hasham Khan is from Sri Lanka, and Plaintiff Isreb is of Syrian descent. The two have distinctly different physical appearances, including different complexion, build, and facial features. The only apparent similarity is that both Khan and Plaintiff Isreb appear to be of Middle Eastern descent and had expressed concern about the situation in Palestine.

120. This mistaken identification during the arrest process further demonstrates that CUPD officers were not making individualized assessments of specific conduct by specific individuals. Instead, officers were targeting attendees based on perceived Middle Eastern ethnicity and/or known or suspected pro-Palestinian political viewpoints.

121. The incident also corroborates BWC evidence from before the Event, in which officers

discussed identifying potential targets based on keffiyehs, "polka-dotted scarves," and "shawls"—markers of cultural and political identity rather than any observed conduct.

122. Upon information and belief, CUPD had been specifically instructed by Cornell administrators to look for Hasham Khan as the author of the opinion piece critical of the event, and this instruction contributed to officers' profiling of Plaintiff Isreb.

123. During the Event, Plaintiff Isreb personally witnessed Cornell President Michael Kotlikoff point out Hasham Khan in the audience during a chaotic moment when CUPD officers were making several arrests. Plaintiff Isreb also recorded video showing Mr. Kotlikoff personally escorting Khan out of the event.

124. CUPD took Plaintiff Isreb's ID, consistent with the process officers were using to record the identities of the people they were arresting, and instructed them to leave the area, stating that there would be follow up.

125. Later that evening, Plaintiff Isreb approached the steps of Bailey Hall and politely asked an officer whether they could assist some female students who had been escorted out in retrieving their coats after the event concluded. This was added to their charge as an instance of "disorderly conduct" though they had not acted in any way disorderly or had any intention of causing public annoyance or alarm.

126. Plaintiff Isreb was arraigned and, under prosecutorial pressure, ultimately accepted an ACD.

127. Cornell issued Plaintiff Isreb a persona non grata order barring them from campus until April 30, 2025, pending the conclusion of university conduct proceedings. The criminal charges were later dismissed and sealed in May 2025.

128. Cornell University subsequently brought disciplinary charges against Plaintiff Isreb. Two

of those charges, relating to their speech during the Q&A, were ultimately dropped. Plaintiff Isreb accepted responsibility for two remaining charges related to their later inquiry about retrieving coats because doing so was necessary to preserve their ability to participate in a Fall 2025 study-abroad program in Jordan that was important to their honors thesis.

129. As a result of Defendants' actions, Plaintiff Isreb has suffered damages including emotional distress, harm to their academic record, consequences in university disciplinary proceedings, and harm to their reputation and standing as a student at Cornell.

**Plaintiff Milton Taam**

130.     Plaintiff Milton Taam is a Cornell alumnus who attended the Event as member of the community.

131.     During the event, when panelist Tzipi Livni spoke about Gaza, Mr. Taam stated from the audience "you turned it into a prison."

132.     A CUPD officer approached and pointed to a young man seated near Mr. Taam, gesturing for him to stand. The young man indicated that the officer had the wrong person and that he had not spoken. A woman in the audience then pointed to Mr. Taam, after which the officer gestured for Mr. Taam to stand.

133.     Mr. Taam promptly complied.

134.     In the lobby, Mr. Taam was informed he was being arrested for disorderly conduct.

135.     Officer Scott R. Grantz processed the arrest though he had not witnessed any disorderly conduct.

136.     At Mr. Taam's first court appearance, the Tompkins County District Attorney moved to dismiss all charges for lack of evidence. The court granted the motion, and the

charges were dismissed outright rather than resolved through an ACD.

137.    Despite the dismissal of the charges, CUPD did not rescind the persona non grata notice issued to Mr. Taam. As a result, Mr. Taam was barred from Cornell University property for an entire year.

138.    The arrest of Milton Taam was without probable cause was part of the broader enforcement operation carried out at the March 10, 2025 Event.

**Plaintiff Barbara Taam**

139.    Barbara Taam is a Cornell University Alumnus and the spouse of Milton Taam.

140.    During the event, Ms. Taam was seated next to her husband in the audience.

141.    Ms. Taam did not realize her spouse had been arrested. Because the arrests were taking place outside of the auditorium and had not been announced to the audience, she was unaware that anyone had been taken into custody.

142.    After Mr. Taam left the auditorium, Ms. Taam remained seated for approximately 30 minutes, continuing to listen to the speakers.

143.    The last speaker represented the United States. After the speaker concluded their remakrs, Ms. Taam stood to leave the auditorium. As she exited, she stated once, "End U.S. military aid to Israel." Ms. Taam was also wearing a keffiyeh.

144.    Like the other arrestees, she was not disruptive or disorderly and had not engaged in any conduct indicating an intent to annoy or alarm the public.

145.    Nevertheless, Ms. Taam was arrested immediately after leaving the auditorium and charged with disorderly conduct.

146.    At her first arraignment, the Tompkins County District Attorney moved to dismiss the charges against Ms. Taam.

147.    Despite this dismissal, the CUPD did not rescind the persona non grata notice

issued to Ms. Taam, and she was barred from Cornell University property for an entire year.

148.    She was also required to retain counsel to defend against the criminal charge.

## VII.    Mid-Event: The Hopkins-Scott Conversation

149.    After some of the arrests were completed inside Bailey Hall, Defendant Kristin C. Hopkins—Chief Administrator to the President and Provost, and the person "in charge" of the Event—entered the corridor and spoke with Lieutenant Scott. This conversation was captured in its entirety on Lieutenant Scott's BWC footage.

150.    In the exchange, Ms. Hopkins asked how many people had been arrested. Lieutenant Scott responded that he would have to update her after he'd gotten everyone processed, to which Ms. Hopkins replied: "But do you feel like you've gotten a decent amount?" The officer responded, "Six or eight maybe" and Ms. Hopkins responded "Okay, Mike's asking…he was just hoping the number would be more…"

151.    In response to this information, Lieutenant Scott and the officer John Doe with him opined that there were more that could be arrested, including perhaps a woman who had been filming them arrest people outside the auditorium, who had not stopped filming when they asked her to.

152.    Lieutenant Scott said they would continue processing arrests, intimating that he would try to find more people to arrest, concluding by saying: "Are you good with that, Kristin, until we figure it out?"

153.    "Mike," as used by Ms. Hopkins, referred to Defendant Michael Kotlikoff, President of Cornell University.

154.    This exchange makes clear that: (a) President Kotlikoff directed and was monitoring the arrest operation in real time; (b) he was disappointed that only

approximately six to eight people had been arrested; (c) he "hoped" for more arrests; and (d) CUPD officers, in direct response to his expressed wish, began identifying additional potential arrestees—including a woman whose only conduct was exercising her First Amendment right to record a matter of public concern — until they arrested at least seventeen people.

155.    This coordination between Cornell's senior administration and CUPD to generate arrests for political purposes—attempting to secure federal funding by demonstrating suppression of pro-Palestinian speech—constitutes a paradigmatic violation of the First and Fourth Amendments.

## VIII.   Cornell and CUPD Acted Under Color of State Law

156.    Cornell and CUPD acted under color of state law and in concert to deprive Plaintiffs' rights.

157.    Cornell University Police Department officers exercise state-delegated law enforcement authority. Under New York Education Law §355 and Criminal Procedure Law §2.10, CUPD officers are sworn peace officers authorized to enforce the New York Penal Law, conduct investigations, carry firearms, and make custodial arrests.

158.    When CUPD officers arrest individuals, those individuals are charged with criminal violations of New York law and prosecuted in state criminal courts. The arrests at issue in this case resulted in criminal prosecutions in the Tompkins County criminal courts.

159.    Because the authority to enforce criminal law and effect arrests is a traditional and exclusive governmental function, CUPD officers act under color of state law when exercising these powers.

160.    Cornell administrators, including President Kotlikoff and Defendant Hopkins, jointly directed and coordinated with CUPD officers to carry out the enforcement operation

at the March 10, 2025 Pathways to Peace event, thereby acting in concert with state actors.

IX.    **Discriminatory Prosecutorial Offers and University Proceedings**

161.    Following arraignment, the seventeen arrests were heavily publicized, including coverage in non-local papers like the New York Post.

162.    Each arrestee's name was published along with the fact that they were charged with the crime of disorderly conduct, and an insinuation that their conduct had been motivated by antisemitism, which harmed their reputation.

163.    Plaintiffs were offered ACDs on a two-tiered basis reflecting their status vis-à-vis Cornell: students were offered six-week ACDs; community members (non-students) were offered six-month ACDs, with a few exceptions.

164.    Upon information and belief, only two students were subjected to the longer six-month ACD offer. These students had participated in publishing an article which was critical of President Kotlikoff's treatment of students critical of Israel.

165.    All Plaintiffs who were not subject to outright dismissal were ultimately forced to accept ACDs—many after extensive delay, emotional strain, and legal fees. Plaintiffs Church and Dolan were the last to accept, doing so only after their criminal cases had been litigated through omnibus motions.

166.    In parallel with the criminal proceedings, Cornell subjected its student Plaintiffs to internal university disciplinary proceedings arising from the same events. These proceedings have harmed Plaintiffs' academic records, standing within the university, and their future prospects in ways that the criminal ACD dispositions alone do not reflect.

167.    The arrestees were issued persona non grata orders barring them from all Cornell campus property—a punishment that, for enrolled students, has severe and ongoing

consequences.

168.    The university disciplinary proceedings reflect the same retaliatory and viewpoint-discriminatory animus that animated the arrests: Plaintiffs were targeted, arrested, prosecuted, and then disciplined not for engaging in unlawful conduct, but for expressing constitutionally protected political viewpoints.


## CLASS ACTION ALLEGATIONS

169.    Plaintiffs bring this action on behalf of themselves, and all others similarly situated, pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.

### Class Definition

170.    Plaintiffs propose a class consisting of all persons arrested by the Cornell University Police Department at or in connection with the Pathways to Peace event held at Bailey Hall, Cornell University, on March 10, 2025, who were charged with disorderly conduct or any other offense arising from their participation in or presence at the event.

171.    Plaintiffs Katie Church, Joshua Dolan, Dina Ginzburg, Taim Isreb, Milton Taam, and Barbara Taam are members of the proposed classes and seek to serve as Class Representatives.

### Rule 23(a) Requirements
### (1) Numerosity — Rule 23(a)(1)

172.    The proposed class consists of at least seventeen individuals arrested at the March 10, 2025 event. While the precise number will be confirmed through discovery, joinder of all class members would be impracticable given the number of affected individuals, their varying circumstances, and the risk of institutional retaliation faced by students and

community members.

## (2) Commonality — Rule 23(a)(2)

173.      There are common questions of law and fact that are central to the resolution of each class member's claims. These common questions include, without limitation:

a. Whether Cornell University, acting through CUPD and its senior administration, engaged in a policy or practice of viewpoint-based enforcement targeting pro-Palestinian speech and expression;

b. Whether the arrests at the March 10, 2025 Pathways to Peace event were directed, authorized, or ratified by Cornell senior administration, including President Kotlikoff.

c. Whether the arrests were made without probable cause;

d. Whether BWC footage documenting Defendant Hopkins's communications with Lieutenant Scott constitutes evidence of a civil conspiracy between Cornell University and CUPD to violate Plaintiffs' constitutional rights;

e. Whether Cornell University, through the statutory colleges and/or CUPD, acted under color of state law within the meaning of 42 U.S.C. § 1983;

f. Whether the selective application of Penal Law § 240.20(4) exclusively to pro-Palestinian attendees, while taking no action against pro-Israel attendees who disrupted the event or committed the only act of physical violence, constitutes a violation of the Equal Protection Clause;

g. Whether the arrests and prosecutions constituted malicious prosecution under New York law;

h. Whether injunctive and declaratory relief is available and appropriate to prevent future violations; and

i. The appropriate measure of damages for class-wide constitutional injury.

174.    The common questions identified above are susceptible to class-wide resolution because the answer to each turns on Defendants' conduct—the policy, planning, and execution of the enforcement operation—rather than on facts unique to individual class members. The pivotal evidence, including the Hopkins/Scott BWC recording, the pre-event officer identification of targets, and the discriminatory non-enforcement against pro-Israel attendees, is identical as to every class member.

## (3) Typicality — Rule 23(a)(3)

175.    The claims of the named Plaintiffs are typical of the claims of the class members they seek to represent. Every class member was arrested, charged, and/or prosecuted by the same Defendants pursuant to the same enforcement policy, arising from the same alleged enforcement operation and course of conduct. All class members suffered the same categories of constitutional injury: violation of First Amendment rights, arrest without probable cause, malicious prosecution, retaliation, and selective enforcement. Plaintiffs' claims arise from the same events, course of conduct, and legal theories as those of the absent class members.

## (4) Adequacy — Rule 23(a)(4)

176.    The named Plaintiffs are adequate representatives of the proposed classes. They have suffered the same injuries as absent class members, have a strong interest in vigorously prosecuting these claims, and have no interests that are antagonistic to those of

the class. Plaintiffs' counsel, Cohen & Green and Gibson Law Firm, PLLC, have substantial experience in civil rights litigation, including class action and complex multi-party litigation, are familiar with the facts and law of this case through prior representation of multiple named Plaintiffs in the underlying criminal proceedings, and are committed to the vigorous prosecution of this class action.

## Rule 23(b) Requirements

## Rule 23(b)(2) — Injunctive and Declaratory Relief

177.     This action is maintainable as a class action under Rule 23(b)(2) with respect to claims for injunctive and declaratory relief, because Defendants have acted on grounds that apply generally to the whole class—namely, a policy and practice of viewpoint-discriminatory enforcement targeting pro-Palestinian speech—making declaratory and injunctive relief appropriate respecting the class as a whole because Defendants' policies and practices remain in effect and continue to pose a risk of future enforcement against protected expression.

## Rule 23(b)(3) — Predominance and Superiority

178.     This action is also maintainable as a class action under Rule 23(b)(3) with respect to claims for damages.

179.     Common questions of law and fact predominate over any questions affecting only individual members. While some individual damages determinations will be required (e.g., the specific emotional distress, academic harm, or reputational injury of each class member), the liability questions common to all class members—including the existence and scope of Defendants' unconstitutional policy, the absence of probable cause, the

existence of a civil conspiracy, and Defendants' intent—overwhelmingly predominate. The
central liability questions concern Defendants' conduct and policies governing the
enforcement operation at the March 10 event, which are common to all class members.

180.     A class action is superior to other available methods for fair and efficient
adjudication of this controversy. Specifically:

   a.  Many class members are students, community members, and individuals of modest
       means who would face significant practical and financial barriers to individual
       litigation against a major university and its police force;

   b.  Several class members accepted ACDs under conditions of institutional and
       financial pressure and may be reluctant to litigate individually for fear of further
       retaliation—including in ongoing university disciplinary proceedings;

   c.   Individual litigation by seventeen or more plaintiffs against the same defendants
       arising from the same event and policy would generate duplicative proceedings,
       inconsistent rulings, and unnecessary burden on the Court and the parties;

   d.  Concentrating all litigation arising from the March 10, 2025 enforcement operation
       in a single class proceeding will promote judicial economy and consistency;

   e.  The class action device allows the full scope of Defendants' unconstitutional
       conduct—including the pre-event targeting, the Hopkins/Scott conversation, and
       the discriminatory two-tier ACD policy—to be presented comprehensively before
       the Court.

181.     The proposed Arrest Class is sufficiently cohesive to permit class treatment. All
members were arrested at the same event pursuant to the same enforcement operation,
charged under the same statute, prosecuted through the same District Attorney's office, and

offered ACDs under the same (discriminatory) structure.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983 – First Amendment**
**(Viewpoint Discrimination, Retaliatory Arrest, and Prior Restraint)**
**(Against All Defendants)**

182.     Plaintiffs re-allege and incorporate by reference all prior paragraphs as though fully set forth herein.

183.     The First Amendment to the United States Constitution prohibits the government from abridging freedom of speech. This prohibition applies to state and local government, and to those acting in concert with state actors, pursuant to the Fourteenth Amendment.

184.     At all relevant times, Defendants CUPD, Scott, Sandy, Carpenter, and the Doe Officers were acting under color of state law as sworn peace officers exercising statutory arrest authority under New York law. Defendants Cornell University, Kotlikoff, and Hopkins jointly participated in and directed these actions in concert with those state actors.

185.     Plaintiffs' speech at the Pathways to Peace event—including chanting political slogans, voicing objections to panelists, speaking during a pre-approved Q&A, wearing a keffiyeh, or uttering a phrase in Hebrew—constituted constitutionally protected political expression of the highest order. Political speech, particularly on matters of war, foreign policy, and government accountability, lies at the core of First Amendment protection.

186.     Defendants arrested Plaintiffs because of the viewpoint Plaintiffs expressed— namely, sympathy for Palestinian rights and opposition to Israeli military actions—and not

because of any conduct that was unlawful or unprotected by the Constitution.

187.     Defendants did not arrest pro-Israel attendees who shouted at Plaintiffs, who disrupted the event, or who committed the sole act of physical violence of the evening. The law was not evenhandedly applied. The enforcement operation was a purposeful, viewpoint-based crackdown on pro-Palestinian speech.

188.     Defendants' enforcement operation constituted viewpoint discrimination in violation of the First Amendment. See *Matal v. Tam*, 582 U.S. 218 (2017); *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995).

189.     Defendants' arrests of Plaintiffs because of the content of their speech constituted retaliatory arrest in violation of the First Amendment. See *Nieves v. Bartlett,* 139 S. Ct. 1715 (2019); *Lozman v. City of Riviera Beach*, 585 U.S. 87 (2018).

190.     With respect to Plaintiff Taim Isreb, whose authorization to speak during Q&A was revoked mid-question based on the disfavored content of their remarks, Defendants also imposed an unconstitutional content- and viewpoint-based prior restraint, supporting the inference that viewpoint discrimination motivated all the arrests.

191.     As a direct and proximate result of Defendants' violation of the First Amendment, Plaintiffs and the proposed class have suffered and continue to suffer damages including loss of liberty, emotional distress, damage to their academic and professional records, reputational harm, and the chilling of future protected expression.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983 – Fourth Amendment

### (False Arrest and Unreasonable Seizure)
### (Against Defendants CUPD, Scott, Sandy, Carpenter, and Doe Officers)

192.     Plaintiffs re-allege and incorporate by reference all prior paragraphs as though fully set forth herein.

193.     The Fourth Amendment protects individuals against unreasonable seizures and false arrests.

194.     Defendants seized and arrested Plaintiffs without any judicial warrant authorizing them to seize any Plaintiff.

195.     Defendants lacked probable cause to arrest any of the Plaintiffs. The conduct attributed to each Plaintiff—brief political statements, verbal objection to a speaker, wearing traditional Palestinian attire, speaking against the killing of children during a pre-authorized Q&A session—does not constitute disorderly conduct under New York Penal Law § 240.20(4) and does not rise to any other chargeable offense. The statute requires both the intent to cause public inconvenience, annoyance, or alarm, and conduct that actually disturbs a lawful assembly to a degree far beyond constitutionally protected expression during a controversial and highly charged event like Pathways to Peace. No such showing can be made with respect to any Plaintiff.

196.     The arresting officer's own admissions—including that the conduct of Plaintiffs Church and Dolan "did not rise to the level" required to issue a persona non grata letter, and yet they were arrested and charged anyway—conclusively demonstrate the absence of probable cause.

197.     With respect to Plaintiff Dina Ginzburg and Barbara Taam, who were arrested outside the building after voluntarily leaving, there is no colorable basis for probable cause whatsoever. The District Attorney's own decision to dismiss their charges confirms this.

198.    With respect to Plaintiff Milton Taam, whose charges were also voluntarily dismissed outright for want of any evidence or witnesses, the prosecution admitted the arrests were wholly without probable cause.

199.    With respect to Plaintiff Taim Isreb, there is no colorable claim that "disorderly conduct" occurred when they were speaking, as authorized and invited, and only escorted out and arrested because the topic of their question became critical of Israel, and all of the children that were being killed by Israel. Likewise, politely asking an officer if they could escort some young women back in to get their coats after the event cannot be construed as "disorderly conduct."

200.    Named Plaintiffs are typical of the rest of the class, who were also arrested without probable cause and instead due to motivations related to their viewpoints and racial identity.

201.    Defendants acted pursuant to a policy, custom, and directive from Cornell University officials—most directly President Kotlikoff—to arrest as many pro-Palestinian attendees as possible, without regard to whether probable cause existed as to each individual.

202.    As a direct and proximate result of Defendants' violation of the Fourth Amendment, Plaintiffs have suffered and continue to suffer damages including loss of liberty, emotional distress, damage to academic and professional records, and reputational harm.

## THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983 – Fourteenth Amendment
### (Equal Protection – Selective Enforcement)
### (Against All Defendants)

203.    Plaintiffs re-allege and incorporate by reference all prior paragraphs as though fully

set forth herein.

204.      The Equal Protection Clause of the Fourteenth Amendment prohibits the government from selectively enforcing the law based on an individual's exercise of First Amendment rights, political viewpoint, race, ethnicity, or national origin.

205.      Defendants enforced Penal Law § 240.20(4) exclusively against individuals who had expressed, or were perceived as holding, pro-Palestinian viewpoints. Pro-Israel attendees who disrupted the event—by shouting at Plaintiffs, throwing a backpack, or otherwise creating disorder—were not arrested or even addressed by CUPD.

206.      The enforcement operation was also infected by racial and ethnic profiling. Before the event began, CUPD officers identified targets by reference to keffiyehs and "shawls"— items of cultural and ethnic significance associated with Palestinian and Arab identity— rather than by observed conduct. During post-arrest processing, a CUPD officer mistook Plaintiff Taim Isreb for another Muslim Cornell student, on the basis of no apparent similarity other than both were perceived to be of Middle Eastern descent and their known pro-Palestinian advocacy. The two individuals are visually distinct in every meaningful respect—different national origin (Syrian vs. Kashmiri), different coloring, different build. The only common denominator was perceived ethnicity and political viewpoint.

207.      This selective enforcement was based on the political viewpoints of the arrested individuals and/or their perceived race, national origin, ethnicity, or cultural identity as Middle Eastern, Arab, Palestinian, or pro-Palestinian persons—all of which are impermissible bases for enforcement under the Equal Protection Clause.

208.      Defendants' discriminatory enforcement of the law violates Plaintiffs' right to equal

protection.

## FOURTH CAUSE OF ACTION
### 42 U.S.C. § 1983 – Civil Conspiracy
### (Against Defendants Kotlikoff, Hopkins, CUPD, Scott, Sandy, Carpenter, and Does)

209.     Plaintiffs re-allege and incorporate by reference all prior paragraphs as though fully set forth herein.

210.     Defendants Kotlikoff, Hopkins, and the CUPD Defendants conspired together to deprive Plaintiffs of their constitutional rights under the First and Fourth Amendments. This conspiracy included the pre-event identification of targets based on their perceived political viewpoints; the coordination of the enforcement operation to generate maximum arrests; the real-time communication between Ms. Hopkins and Lieutenant Scott during and after arrests; the express desire to arrest more people; and the brainstorming of additional arrests to satisfy the University's political objectives.

211.     Cornell University participated in this conspiracy by directing, ratifying, and facilitating the unconstitutional enforcement operation—including through the roles of its senior administrator (Hopkins) and its police force (CUPD).

212.     Each Defendant took overt acts in furtherance of the conspiracy, including: identification and targeting of audience members; arrest of Plaintiffs without probable cause; preparation of supporting depositions three days after the event without contemporaneous notes or BWC audio; and coordination of post-arrest strategy to increase the number of arrests.

213.     As a direct and proximate result of this conspiracy, Plaintiffs were deprived of their constitutional rights and suffered the damages described herein.

## FIFTH CAUSE OF ACTION

### Monell Liability – 42 U.S.C. § 1983
### (Against Defendants Cornell University and CUPD)

214.     Plaintiffs re-allege and incorporate by reference all prior paragraphs as though fully

set forth herein.

215.     The unconstitutional acts described herein were carried out pursuant to official

policy, custom, or practice of Cornell University and CUPD, within the meaning of *Monell*

*v. Department of Social Services*, 436 U.S. 658 (1978).

216.     Specifically: (a) CUPD's enforcement operation on March 10, 2025 was directed

and approved by the highest policymaking official of the university, President Kotlikoff

himself; (b) the operation was coordinated through his designated representative,

Defendant Hopkins; (c) the enforcement policy of targeting pro-Palestinian speakers and

attendees reflected a pre-existing and ongoing institutional policy and custom, as evidenced

by Cornell's prior monitoring of pro-Palestinian faculty and students; and (d) the two-tiered

ACD offer structure, approved at the institutional level, itself reflects discriminatory

institutional policy.

217.     Where a constitutional deprivation is directed and supervised by the final

policymaker of an institution, the institution is liable under § 1983 without separate proof

of a longstanding custom. See *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988);

*Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986).

218.     Here, President Kotlikoff personally directed the arrests and expressed

dissatisfaction that there were not more of them, making him the final policymaker whose

unconstitutional decisions are directly attributable to Cornell.

219.     Likewise, Anthony Bellamy, then Chief of CUPD, knew that the Pathways to Peace
event would likely be politically charged, failed to train the police force not to engage in
viewpoint suppression or make arrests for protected activity, and did not dissolve the
persona non grata notices when the charges were dropped against the arrestees, or when he
received notice of claims from the arrestees.

220.     Upon information and belief, Chief Bellamy encouraged the CUPD to make
viewpoint arrests as requested by President Kotlikoff, his boss.

**SIXTH CAUSE OF ACTION**
**New York State Law – False Arrest and False Imprisonment**
**(Against Defendants Cornell University, CUPD, Scott, Sandy, Carpenter, and Does)**

221.     Plaintiffs re-allege and incorporate by reference all prior paragraphs as though fully
set forth herein.

222.     Under New York law, a false arrest claim requires: (1) that the defendant intended
to confine the plaintiff; (2) that the plaintiff was aware of the confinement; (3) that the
plaintiff did not consent to the confinement; and (4) that the confinement was not otherwise
privileged.

223.     Defendants intended to and did confine each of the Plaintiffs. Each Plaintiff was
aware of and did not consent to the confinement. The arrests were not privileged because
they lacked probable cause

224.     Defendants are liable to Plaintiffs for damages arising from their false arrest and
imprisonment.

225.     Plaintiffs each timely filed notices of their state and federal claims within ninety
days of the arrests on all Defendants and all Defendants failed to redress the claims prior

to the filing of this suit, within one year of the occurrence

## SEVENTH CAUSE OF ACTION
### 42 U.S.C. § 1983 – Malicious Prosecution
### (Against Defendants Cornell University, CUPD, Hopkins, Scott, Sandy, Carpenter, and Does)

226.     Plaintiffs re-allege and incorporate by reference all prior paragraphs as though fully set forth herein.

227.     Under federal law, a malicious prosecution claim requires: (1) initiation of a criminal proceeding; (2) without probable cause; (3) with malice; and (4) termination of the proceeding in Plaintiffs' favor.

228.     Defendants initiated criminal proceedings against Plaintiffs by preparing and submitting arrest reports, supporting depositions, and accusatory instruments and by causing them to be charged and prosecuted.

229.     Defendants lacked probable cause. The criminal proceedings were initiated with actual malice, as demonstrated by the pre-event targeting, the post-arrest admission of desire for more arrests, the use of supporting depositions prepared days after the event without contemporaneous notes or audio, and the institutional interest in satisfying federal pressure to suppress pro-Palestinian speech.

230.     All criminal proceedings against Plaintiffs terminated in their favor: the Taam Plaintiffs' charges were dismissed outright; Ms. Ginzburg's charges were dismissed by prosecutorial motion; and all remaining Plaintiffs received ACDs, which constitute favorable termination for purposes of a malicious prosecution claim under *Thompson v. Clark,* 142 S.Ct 1332, 1338 (2022).

231.     Defendants are liable to Plaintiffs for damages arising from their malicious

prosecution.

## DAMAGES

232.    As a direct and proximate result of Defendants' violations of Plaintiffs' and class

members' constitutional rights and New York common law, Plaintiffs and class members

have suffered and continue to suffer the following damages:

f.   Loss of liberty during the period of unlawful arrest and detention;

g.   Emotional distress, including anxiety, fear, humiliation, and trauma associated with
arrest, criminal prosecution, and university disciplinary proceedings;

h.   Damage to academic records, standing, and future career prospects;

i.   Harm to professional and personal reputation;

j.   Costs of legal defense in the criminal and university proceedings;

k.   Ongoing chilling of First Amendment rights, including the right to engage in
political expression on matters of public concern;

l.   Issuance of persona non grata orders barring certain Plaintiffs from Cornell's
campus, which for enrolled students constitutes an ongoing deprivation of access
to their own educational institution or community and political events;

m.  Other damages to be proven at trial.

233.    Plaintiffs seek nominal and compensatory damages in an amount to be determined

by the jury.

234.    Defendants acted with malice, deliberate indifference, or reckless disregard for Plaintiffs' constitutional rights. Plaintiffs therefore seek punitive damages against the individual Defendants in their individual capacities, in an amount sufficient to deter similar misconduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed classes, respectfully request that this Court enter judgment:

a.    Certifying this action as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

b.    Declaring that Defendants' conduct violated Plaintiffs' and class members' rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution and under New York State law;

c.    Awarding Plaintiffs and class members compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial;

d.    Awarding punitive damages against the individual Defendants in their individual capacities, in amounts sufficient to deter future unconstitutional conduct;

e.    Ordering Defendants Cornell University and CUPD to expunge from all university,

police, and disciplinary records any reference to the arrests, charges, or university disciplinary proceedings arising from the events of March 10, 2025, as to each class member;

f.   Ordering Defendants Cornell University and CUPD to rescind all persona non grata orders issued to Plaintiffs and class members in connection with the events of March 10, 2025;

g.    Defendants from engaging in viewpoint-based or content-based enforcement of laws and regulations against attendees at Cornell events, from directing or facilitating arrests for the purpose of satisfying political or financial institutional interests rather than on the basis of lawful probable cause, and from retaliating against students, faculty, or community members for exercising their First Amendment rights in connection with the conflict in Gaza or the treatment of the Palestinian people;

h.   Ordering Defendants to implement and enforce written policies, subject to Court oversight, governing the circumstances under which CUPD may arrest event attendees, prohibiting coordination between university administration and CUPD for the purpose of generating arrests based on speech content, and ensuring that enforcement at Cornell events is applied evenhandedly regardless of the political viewpoints expressed;

i.   Awarding Plaintiffs and class members reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and other applicable law;

j.   Awarding pre-judgment interest on all sums recoverable including attorneys' fees and costs; and

k.   Awarding such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand

a trial by jury on all issues so triable.

DATED this 9th day of March 2026.

Gibson Law Firm, PLLC

*/s/ Sujata S. Gibson*

**Sujata S. Gibson,**
*Attorney for Plaintiff*
Gibson Law Firm, PLLC
120 Buffalo Street, Suite 2
Ithaca, NY 14850
(607) 327-4125
sujata@gibsonfirm.law

COHEN&GREEN PLLC

By: **Elena L. Cohen**
      **Sarah Kunstler, Of Counsel**
1639 Centre Street, Suite 216
Ridgewood (Queens), NY 11385
t: (929) 888-9480
elena@femmelaw.com