UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

------------------------X

KATIE CHURCH, JOSH DOLAN, DINA
GINZBURG, TAIM ISREB, BARBARA
TAAM, and MILTON TAAM, individually and
on behalf of all others similarly situated,

                                        3:26-cv-381-ECC-MJK

                Plaintiffs and Proposed Class.
                Representatives,
                 -against-

CORNELL UNIVERSITY; CORNELL
UNIVERSITY POLICE DEPARTMENT;
MICHAEL KOTLIKOFF, in his individual and
official capacities as President of Cornell
University; KRISTIN C. HOPKINS, in her
individual and official capacities;
LIEUTENANT MICHAEL SCOTT, in his
individual and official capacities; SERGEANT
KYLE SANDY, in his individual and official
capacities; OFFICER WILLIAM D.
CARPENTER, in his individual and official
capacities; OFFICER SCOTT R. GRANTZ, in
his individual and official capacities; OFFICER
BEVERLY VAN CLEEF in her individual and
official capacities; OFFICER BRYANT
WYANS in his individual and official
capacities; OFFICER JOSEPH CANZANO in
his individual and official capacities; and JOHN
and JANE DOES 1–20,

- ------------------------X

**DECLARATION OF MILTON L. TAAM**

I, Milton L. Taam, declare under penalty of perjury as follows:

1. I am a plaintiff in the above-captioned civil rights action pending in the Northern District of New York.

2. I submit this declaration in support of my emergency motion for a temporary restraining order concerning the Persona Non Grata notice issued to me by the Cornell University Police Department following the events of April 30, 2026.

3. I am a Cornell University alumnus who resides in Tompkins County, where Cornell University is situated, with my wife, who is also a Cornell alumnus.

4. On or about April 30, 2026, I was issued a Persona Non Grata ("PNG") notice by the Cornell University Police Department ("CUPD") barring me from Cornell University property for three years.

5. Upon information and belief, this PNG was issued to chill my protected speech and retaliate against me. I did nothing to warrant the issuance of the PNG. Relevant facts and context are as follows.

**April 30, 2026 Cornell Debate**

6. On the evening of April 30, 2026, my wife and I attended a debate at Cornell University that was open to the public about the Israel-Palestine conflict.

7. My wife and I arrived early to the debate, sat in the front row.

8. Cornell University President, Michael Kotlikoff entered early and also sat in the front row, a dozen seats away.

9. We were surprised and gratified to see him.

10. My wife walked over and gave Kotlikoff our book *Palestine - People, Land, and Solidarity: With Our Own Eyes 1977, 2009, Today,* our first-hand visual chronicle of a

people struggling for their land and freedom across decades, and the impact on the Cornell campus. She explained that this new book was co-authored by Cornell alumni. Kotlikoff accepted the book (and later carried it to his car).

11. The event began with hope for dialogue. The hall was jam-packed and buzzing with enthusiastic students, many in suits. The facilitator of the debate emphasized the pride the group took in having such diverse co-hosts, including Students for Justice in Palestine and Cornellians for Israel.

12. President Kotlikoff gave a short introduction to the event. I don't think his presence had been advertised in advance.

13. One of the speakers, Dr. Norman Finkelstein, began with pointed criticism of the Cornell administration for suspending, repressing and risking deportation of Cornell students who called for the divestment from weapons manufacturers and spoke in solidarity with Palestinians. He emphasized that it's not too late for the administration to reverse course and honor the students who risked themselves and their education for Palestine.

14. Dr. Finkelstein then gave a searing indictment of Israel. We did not know what reaction to expect from the crowd of students, many in suits. During the course of Dr. Finkelstein's speech, followed by 8 student debaters, the overwhelming applause in support of Dr. Finkelstein's statements versus the more limited expressions of disagreement (through hissing and so forth) made it clear that most students were very critical of Israel.

15. One student debater directed a comment to President Kotlikoff by name, urging him to learn and take note.

16. The event was spirited but peaceful and respectful, particularly from the audience members who seemed to share concern about Israel's actions towards Palestinians.

**The Conversation Between Kotlikoff and Students After the Event**

17. After the debate and resounding applause, while my wife rushed to talk with Dr. Finkelstein, I saw President Kotlikoff leaving and thought it was an opportunity to talk with him.

18. In the hallway just outside the debate room, I saw students engaging in dialogue with President Kotlikoff. They in no way accosted or surprised him.

19. I was interested in the respectful questions the students were posing and observed them in the hallway and later as they walked with President Kotlikoff out of the auditorium and towards the parking lot.

20. Nothing I witnessed supports President Kotlikoff's claim that anyone "accosted him" or loudly shouted at him.

21. It is normal for audience members to talk with a speaker and other prominent people after an event, especially at a university.

22. Students asked President Kotlikoff questions of importance to them, including questions about student arrests and suspensions for expressing support for Palestinians, which had been the topic of Cornell Student Assembly resolutions a week or so previous.

23. I primarily observed the conversation. I stood in the crowd around Kotlikoff, listening to the students. I did not know any of them. During a pause I introduced myself to President Kotlikoff as co-author of the book which he still carried on Palestine. When students asked Kotlikoff about arrests of Cornell students on campus, I mentioned to Kotlikoff that I, too, had been arrested. "Where?" he asked. "At Bailey Hall, last year," I replied. I told him that my charges were dismissed and that six of us have filed a lawsuit against Cornell, CUPD and him for falsely arresting us and violating protected political expression. I spoke no

more, as I was interested to hear the dialogue between the students and Cornell's President on this important topic.

24. As the students walked and continued to dialogue alongside President Kotlikoff about 500 feet to the parking area, I followed nearby and witnessed them.

25. The students, led by a young woman, continuing their line of questions to President Kotlikoff about free speech and repression on campus. I was impressed by the thoughtful questions asked.

26. I heard President Kotlikoff at some point tell students he had nothing else to say and did not want to be photographed.

27. I find this extremely unusual. In my many years as an active alum, attending years of weekly energy seminars, mentoring graduate students, attending events and collaborating with faculty and students on published papers, I have never seen a faculty member cut off dialogue with students so curtly. I assumed that a university president would be glad to hear and engage with students. I recalled the contrast, being at Barton Hall in 1969, when then Cornell President Perkins met with 8,000 students in the wake of the Willard Straight Hall takeover.

28. I witnessed the students acting normally, politely, and eloquently. In my view, President Kotlikoff's emotional reactions (feelings of being "accosted," "followed" and "loudly shouted at" according to his press statements) were wholly unsupported by what I saw and appeared to stem from disagreement or discomfort with the content of their viewpoints, not the manner in which they were speaking or behaving.

29. President Kotlikoff has repeatedly expressed open hostility to criticism of Israel, and has himself been repeatedly accused of attempting to chill academic freedom and student and

community speech on this issue. One of many examples was documented in a Cornell Sun Article written in December 2024. A true and accurate copy of this article is attached hereto as      Exhibit      1      and      can      be      found      online      at: https://www.cornellsun.com/article/2024/12/lieberwitz-interim-president-kotlikoff-has-violated-faculty-academic-freedom.

30. When we reached the Day Hall parking lot, President Kotlikoff entered his car, although students seemed to want to continue talking with him.

**President Kotlikoff Hit Students with His Car**

31. I prepared to leave to find my wife. Some students were still near President Kotlikoff's car as he was backing out of a parking space. I heard students shout out that President Kotlikoff had hit them.

32. At this point I was naturally concerned about the safety of the students, so I approached President Kotlikoff's car window and politely knocked on it from the side to try to inform him that he had hit some students.

33. When President Kotlikoff declined to open his window to talk, I went to the front of the car and took a photo to document the situation.

34. As I was photographing, President Kotlikoff appeared to suddenly drive towards me.

35. Fearing for my own safety I moved to the side. (Looking at the video a few days later, I think he was pushing me aside with his car, and I mentioned this to CUPD Officer Carpenter on May 4 when CUPD came to my house to serve the PNG.)

36. President Kotlikoff then exited the Day Hall parking lot without acknowledging what he'd done.

37. At least two students were hit by President Kotlikoff. One student's foot was run over.

38. I suggested that the students call CUPD to report the incident and ask for help.

39. Soon I heard the student talking with a person appearing to be CUPD, giving the license plate of the car and apparent direction it was heading. I left.

40. President Kotlikoff made a number of provable misstatements to the press and through the University's own communications channels about the incidents I just described that do not reflect what occurred. For example, he claimed students were "banging" on his car when he ran them over, but video footage from the university clearly shows that was not the case. No one banged on his car. Nor were students yelling at him.

41. The Cornell Sun has copies of the video footage and an overview of President Kotlikoff's misstatements and what occurred in an article dated May 1, 2026, which is printed and attached hereto as Exhibit 2 and available online at https://www.cornellsun.com/article/2026/05/kotlikoff-drives-into-student-and-recent-grad-following-harassment

42. Footage from video security cameras owned and operated by Cornell is also publicly available. A true and accurate copy of Cornell's security footage is available online at: https://statements.cornell.edu/2026/20260501-video-of-incident-at-day-hall.cfm

43. WSKG news media and ABC news also have publicly available video footage available at https://abcnews.com/US/cornell-university-president-accused-backing-student-parking-lot/story?id=132618765 (ABC News) and https://www.wskg.org/regional-news/2026-05-02/videos-show-cornell-university-president-reversing-car-into-students

44. I have carefully reviewed the linked video footage and coverage from these sources, and they are consistent with what I personally observed.

45. It was truly terrifying to see a University President appear to knowingly hit students when faced with polite questions about documented free speech violations and conflicts of interest in the student disciplinary process at Cornell. I was also personally shaken up that President Kotlikoff had aggressively driven towards me when I tried to alert him and document what occurred.

46. It is even more shocking that he would leave the scene of the accident without speaking to the CUPD and without acknowledging what had occurred and then serve me with a PNG for simply witnessing the event and attempting to alert him that he was physically harming students.

47. I did not engage in violence, threats, obstruction, trespass, or any conduct that violated any law or Cornell policy.

48. On the contrary, I witnessed President Kotlikoff engage in a hit and run and merely attempted to document it and alert him.

49. To this day, I have not been charged with any offense arising from the April 30, 2026 incident.

**The April 30 PNG and My Efforts To Provide My Account**

50. Nonetheless, on or about May 4, 2026, CUPD officers came to my home and served me with a three-year PNG, dated April 30, 2026, allegedly for "trespassing." I did not trespass at any time. The event was open to the public, and the entirety of the walk from Day Hall to the parking lot, including the parking lot, was also open to the public. I was never asked to leave or given any indication that I was not welcome anywhere that night.

51. A true and accurate copy of the redacted April 30 PNG was printed in the Cornell Sun in an article dated May 15, 2026, which is printed and attached hereto as Exhibit 3, and

available online at https://www.cornellsun.com/article/2026/05/alumnus-present-at-kotlikoff-car-incident-issued-persona-non-grata-3-year-ban-from-campus.    The April 30 PNG is also attached hereto as Exhibit 4.

52. The incident I witnessed garnered national news attention and President Kotlikoff was under heavy criticism for how he handled himself during and after the incident.

53. On May 5, I contacted CUPD to get permission to set foot on campus to visit the CUPD headquarters to give officer William Carpenter a statement to be used in the ongoing investigation of President Kotlikoff's actions that night.

54. At the office, Officer Carpenter said he wanted to take me to the "questioning room" so he could ask me questions about the incident but noted I was waiving my right to an attorney. I did not want to waive that right, as I have been falsely accused by CUPD before (which is why I am currently in this lawsuit against CUPD) and was just issued with a meritless PNG. I asked if I could at least bring my wife to witness our conversation but Officer Carpenter refused this request.

55. I therefore declined the request to go to the questioning room but I was assured by officer Carpenter that my written statement would be included in the police report of the incident. A true and accurate copy of the statement I left with Officer Carpenter is attached hereto as Exhibit 5 and it reflects what I saw and witnessed on April 30, 2026.

56. On May 7, 2026, Cornell's Board of Trustees announced the creation of an "Ad Hoc Special Committee" to "oversee" CUPD's investigation into the events of April 30, 2026. A true and accurate copy of the announcement is attached hereto as Exhibit 6.

57. On May 9, 2026, I sent an email to CUPD Chief Eric Stickel asking that Cornell immediately rescind the April 30 PNG. A true and accurate copy of that email is attached hereto as Exhibit 7.

58. On May 15, 2026, just before graduation, an "Ad Hoc" committee of Cornell University Board of Trustees reviewed selective information provided to them by CUPD and issued a statement. A true and accurate copy of the statement is attached hereto as Exhibit 8, not for the truth of what it says but for the fact that it was said.

59. The statement suggests CUPD did not give the committee full and accurate information. For example, the committee alleges that "the individual at the scene who reported that the vehicle made contact refused medical treatment from the EMS team and refused to provide sworn statements as to their account of the incident. None of the individuals at the scene have provided sworn statements to CUPD, despite CUPD's repeated attempts to collect sworn statements in the days following the incident."

60. This statement does not reflect that I provided a written statement, and that I declined only to submit to questioning in an interview room without counsel or a witness present.

61. I subsequently emailed the Cornell University Police Department Records Division on May 17, making a formal request for "a copy of the official police report and all associated records regarding the recent parking lot incident involving University President Michael Kotlikoff." They did not reply. A true and accurate copy of that email is attached hereto as Exhibit 9.

62. On May 20, 2026, a guest contribution I wrote May 2, 2026 was published in the Cornell Sun discussing what I had witnessed and providing photographs. A true and accurate copy of this article is attached hereto as Exhibit 10 and is available online at

https://www.cornellsun.com/article/2026/05/guest-room-kotlikoff-weaponizes-dialogue.

63. The same day, CUPD came to my house for a second time and served me with a different 3-year PNG. A true and accurate copy of this May 20, 2026 PNG is attached hereto as Exhibit 11.

64. The main difference between the April 30 and May 20 PNG is the reason given for the ban. Instead of "trespass" the new PNG alleges that "On 4/30/2026 at 8:21 p.m. while in the Day Hall parking lot, you restricted a motor vehicle's ability to maneuver while it was in motion. Additionally, by admission, you 'knocked' on the vehicle's window while it was in motion, and further intentionally stepped in front of the vehicle impacting its operation."

65. This allegation is inaccurate. President Kotlikoff's car was not in motion when I knocked on the window and he was backing up when I stepped in front of it to photograph him as he had just run into some students.

66. There is nothing in the student code of conduct or any law I am aware of that prohibits an observer from trying to alert a driver that he's run over a student, nor to document a driver's attempt to flee the scene after a hit and run.

67. On May 22, CUPD Chief Eric Stickel responded to my email requesting recission, explaining that "after careful review," he had decided to rescind the April 30 PNG and replace it with the PNG issued on May 20. That email is attached as Exhibit 12.

68. I have exhausted all administrative avenues known to me for resolving this new PNG by emailing CUPD and requesting it be rescinded.

69. My attorney also attempted to work with CUPD's attorneys but they are unwilling to lift the PNG.

**Retaliatory Pattern**

70. I believe my protected viewpoints and my association with advocacy concerning Palestinian human rights played a role in Cornell's decision to issue the April 30, 2026, Persona Non Grata notice.

71. The underlying lawsuit in this matter was filed after CUPD falsely arrested me at another event last year called "Pathways to Peace" held at Bailey Hall on March 10, 2025.

72. At that event, CUPD officers are caught on body camera footage speaking to President Kotlikoff's assistant, who was telling them that "Mike" (meaning President Michael Kotlikoff) was hoping that the CUPD could arrest more people (at that point they had only arrested only 6 or 8 people).

73. Shortly thereafter, I was falsely charged with "disorderly conduct" though I had not acted disorderly in the slightest. I was also served with a one-year PNG, which expired in March 2026.

74. At my arraignment, the District Attorney, on his own motion, moved to dismiss the charges against me for lack of any evidence of wrong-doing.

75. My charges were thus dismissed but the PNG was not rescinded. Many others were also falsely arrested that night, based on the content of their speech rather than any other differentiating conduct. As the underlying lawsuit sets forth in more detail, other persons, who support Israel, were not arrested despite similar or worse behavior during the March 10, 2025 event.

76. The only act of violence that took place at the event was when a pro-Israel audience member threw a backpack at a student wearing a keffiyeh. That back-pack throwing

individual was never arrested or charged or issued a PNG despite the incident being captured on video and reported to the police in real time.

77. Issuing PNGs to students and community members who are critical of Israel's behavior towards Palestinians, and/or the University's treatment of students and faculty who express such concerns chills ongoing speech.

**Ongoing Harm**

78. The PNG notice imposes substantial and continuing personal, professional, and community hardship on me.

79. Cornell owns a substantial amount of the property in Ithaca and surrounding areas. I do not know what precise property is off limits, which presents a chilling impact on my speech.

80. For example, is my presence in College Town, which are off campus streets open to the public where many businesses and other privately owned spaces are located, forbidden? Some properties in this area of town are owned or maintained by Cornell, as is property at the airport complex and many other locations that I frequent.

81. Similarly, Cornell manages at least 22 nature preserves, and more than 3,600 acres of biologically diverse landscapes, most of which are open to the public to enjoy and not clearly demarcated as "Cornell" property, including off-campus natural areas such as bogs, glens, meadows, old-growth forests and wildflower preserves. See, e.g., https://cornellbotanicgardens.org/explore/off-campus-natural-areas.

82. My own house borders one such nature preserve.

83. The grocery store I shop in regularly is in a plaza owned by Cornell.

84. My business and social life are also deeply intertwined with the University. My wife and I both attended Cornell.

85. I have long been an active Cornell alumnus.

86. I have been engaged with Cornell students and faculty on clean-energy projects, seminars, and alumni activities, as well as mentoring.

87. My family and I planned to attend Cornell Reunion 2026, which is scheduled to take place from June 4 through June 7, 2026.

88. This is an important opportunity for me and my family. My daughter also attended Cornell, and she is bringing our grandchild to alumni weekend, which we were all planning to attend together. I was really looking forward to sharing with my granddaughter the sites and memories from this campus that has been a big part of our family's lives.

89. The Persona Non Grata notice prevents me from participating in Cornell Reunion 2026 with my family.

90. I have for many years attended events hosted by Rev: Ithaca Startup, a collaboration between Cornell, Ithaca College and the local community college to bring entrepreneurs, startups and funders and mentors together to help foster startups.

91. I am registered to attend a Rev:Ithaca networking meeting on June 11, 2026. Upon information and belief, the PNG does not allow me to go to this event because Cornell is one of several sponsors, and the space where it is occurring appears to be leased by Cornell.

92. This is an important opportunity for me and the engineering work that I do.

93. The Persona Non Grata notice also interferes with my ability to participate in other Cornell-related educational, professional, alumni, and social events.

94. During the school year, I typically attend the weekly Cornell Engineering Energy Seminars that are important networking events for my work in clean energy.

95. I also regularly attend lectures and concert series with my wife and socialize with colleagues and friends in or near campus.

96. I have also been invited to be a guest speaker at the Asian American Studies Program next fall.

97. In a community of our size, which is centered around Cornell and campus life, the PNG has a serious impact on me and my family and has the effect of chilling my speech and more importantly a chilling effect on free speech by other members of the community who voice points of view that are not embraced by President Kotlikoff.

98. The facts stated in this declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

MILTON L. TAAM

Executed on June 1, 2026 at Ithaca, NY